IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHEYENNE H., by and through her　　　:
parents, Elizabeth H. and David H., and　:
ELIZABETH H. and DAVID H.　　　　　:
individually, of Effort, PA   18330　　　:
　　　　　　　　　　　　　　　　　: 　　Civil Action
　　　　　　Plaintiffs　　　　　　　:
　　　v.　　　　　　　　　　　　　: 　　No.
　　　　　　　　　　　　　　　　　:
PLEASANT VALLEY　　　　　　　　:
SCHOOL DISTRICT　　　　　　　　 :
2233 Route 115　　　　　　　　　　:
Brodheadsville, PA   18322　　　　　 :
　　　　　　　　　　　　　　　　　:
　　　　　　Defendant　　　　　　 :

## COMPLAINT

I.　　**Introduction**

1.　　The Defendant Pleasant Valley School District ("School District") has never met the educational needs of Plaintiff Cheyenne H. ("Cheyenne"), a minor child with disabilities, despite its knowledge of her lack of meaningful progress and even clear regression while she was a student enrolled in its schools.

2.　　Cheyenne is currently entering the tenth grade, and is a child diagnosed with Specific Learning Disabilities; Unspecified Anxiety Disorder; Attention Deficit Hyperactivity Disorder; Language Processing Disorder; Spoken Language Disorder; Executive Function Disorder; and Language-Based Learning Disability. She is well below age and grade expectations particularly in reading. Her speech and language needs impact her throughout her school day.

3.　　She requires intensive research-based specially designed instruction, yet the District has admittedly failed to provide the instruction she needs.

1

4.      On October 7, 2024, her parents, Elizabeth H. and David H. ("Parents," and to-gether with Cheyenne, the "Plaintiffs" or the "Family"), filed an administrative special education due process complaint against the School District. Following a due process hearing held virtually on February 18, 2025, and April 15, 2025, the Hearing Officer, Cathy A. Skidmore, Esquire, issued a Final Decision and Order ("Decision") on May 20, 2025, finding against the Family due to several significant and reversible errors of law.

5.      This action is brought by Cheyenne H. by and through her parents, Elizabeth H. and David H., individually, appealing the Decision.

6.      The Family's claims are brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq.; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq.; Title IX of the Educational Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681; the federal and state implementing regulations of the foregoing statutes; and Chapters 14 and 15 of the Pennsylvania Code.

7.      After fully and independently considering the entire record and the failures of the District to provide Cheyenne with a FAPE, this Court should determine that the District violated the foregoing statutes and reverse the Hearing Officer's Decision.

8.      Specifically, this Court should (1) hold that all claims were timely because the Parents timely filed after they "knew or should have known" of the District's failure to meet Cheyenne's needs which was—at earliest—when Parents received a December 21, 2023 Reevaluation Report from Cheyenne's new charter school showing additional unmet special education needs; (2) award the Family full days of compensatory education from the beginning of the 2021-22

2

school year until Cheyenne's withdrawal from the District on September 27, 2023; (3) find that the District failed to appropriately respond to the sexual harassment that Cheyenne experienced in school and award damages for the District's failures to address the sexual harassment under Title IX; (4) award reasonable attorneys' fees and costs to Cheyenne's Family; and (5) award any other relief this Court deems just.

## II.    Parties

9.     Cheyenne was born in 2010 and is an eligible student with disabilities under IDEA, and a Protected Handicapped Student under Section 504 and the ADA.

10.     At all times, for which the Family seeks a remedy (the start of the 2021-22 school year through September 27, 2023), Cheyenne resided in and was enrolled in the District. She withdrew from the District on September 27, 2023.

11.     While enrolled in the District, Cheyenne was identified under IDEA as a student with a Specific Learning Disability in the areas of Basic Reading, Reading Fluency, and Reading Comprehension.

12.     Additional evaluations completed after Cheyenne withdrew from the District have also determined that she qualifies as a student with Other Health Impairment and Speech and Language Impairment, but these areas of eligibility were not identified by the District.

13.     Elizabeth H. and David H. are Cheyenne's parents. At all times relevant to this action, they have resided in Effort, Pennsylvania, within the geographical boundaries of the District.

14.     The District is located at 2233 Route 115, Brodheadsville, Pennsylvania. The District is the recipient of several sources of federal funds and is an educational agency designated by

3

Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries. It is responsible for honoring the substantive and procedural rights of eligible children and their parents under IDEA, Section 504, ADA, and Title IX, and all regulations and policies thereunder, and Chapters 14 and 15 of Title 22 of the Pennsylvania Code.

### III.    Jurisdiction and Venue

15.    This Court has original jurisdiction over this appeal because this case raises federal questions under the IDEA, Section 504, ADA, and Title IX. 28 U.S.C. § 1331.

16.    Plaintiffs exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a special education due process hearing. *See* 20 U.S.C. § 1415(i)(2)(A).

17.    The Family's claims and remedies are authorized by 20 U.S.C. § 1415; 29 U.S.C. § 794(a); 28 U.S.C. §§ 2201 and 2202; and 20 U.S.C. § 1681 et seq. *See also Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.,* 526 U.S. 629, 640-41, 119 S. Ct. 1661 (1999) (money damages for student-on-student sexual discrimination). These statutes and the binding case law interpreting them provide for declaratory and equitable relief (and, for Title IX, money damages), and any further relief that this Court deems necessary and proper.

18.    All of the Defendant's complained-of actions have taken place within the jurisdiction of the United States District Court for the Middle District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

### IV.    Standard of Review

19.    This Court is required to undertake a fully independent review of the records and

the Hearing Officer's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S. Ct. 3034, 3051 (1982). This review is far broader and more searching than a district court's review of other administrative matters. Judicial review in IDEA cases is called "modified de novo" review because it "differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson School District*, 70 F.3d 751, 757 (3d Cir. 1995).

20.     In conducting this independent review, district courts: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

21.     In conducting a modified de novo review, district courts give "due weight" to the factual findings of the administrative agency. *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "Due weight" means that although the district courts must consider the administrative fact findings, the courts are free to reject such findings. *Id*. at 269-70. Thus, when reviewing an administrative proceeding in an IDEA case, the district court should "defer to the hearing officer's factual findings," unless it can point to contrary non-testimonial extrinsic evidence in the record. *Carlisle Area School District v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995). If the Court does not accept these factual findings, it needs to explain why. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

22.     The modified de novo review under the IDEA does not apply to Section 504 and ADA claims. *Le Pape v. Lower Merion School District*, 103 F.4th 966, 983 (3d Cir. 2024). Thus, a federal district court applies a de novo standard of review for Section 504 and ADA claims, as

opposed to the modified de novo standard of review that the Court will apply for the IDEA claims. *Id*. Plaintiffs' Title IX and ADA claims are properly raised before this Court as administrative hearing officers from the Office for Dispute Resolution do not have jurisdiction over Title IX or ADA claims because their jurisdiction is limited to IDEA and Section 504 claims. 20 U.S.C. § 1415(f); 34 C.F.R. §§ 300.507, 300.511; 22 Pa. Code §§ 14.101 – 14.163; 22 Pa. Code §§ 15.8, 16.63.

## V.    **Applicable Law**

### A.    **IDEA requires that a school district comprehensively evaluate students with disabilities to determine their educational needs.**

23.    According to IDEA, school districts must, at a minimum, evaluate students with disabilities at least every three years, commonly known as a "triennial evaluation." 34 C.F.R. § 300.303(b)(2).

24.    In such evaluations, a school district must use a variety of assessment strategies to gather relevant information about the child and must assess the child "in all areas related to the suspected disability." 34 C.F.R. § 300.304(c)(4).

25.    The public agency must ensure that a student's "evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

26.    Similar to IDEA, Section 504 and its regulations require the identification of all children with disabilities and the provision of appropriate educational services. 29 U.S.C.§ 794; *see also* 34 C.F.R. § 104.1 *et seq.*

27.    Section 504 requires that "a public elementary or secondary education program

shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; *see also Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999).

> **B.    After the school district identifies a student's needs in an evaluation report, the IEP Team must use the report to create an IEP and offer a student a Free Appropriate Public Education.**

28.    At the beginning of each school year, a school district is required to develop an IEP that provides a Free Appropriate Public Education ("FAPE") for each child with a disability who resides within its jurisdiction. 20 U.S.C. § 1414(d)(2)(A).

29.    IDEA's central purpose is to ensure that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

30.    Likewise, under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" under Section 504, is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

31.    The IDEA provides that an IEP team, which includes both school officials and the

child's parents, must develop an appropriate educational program and placement for each eligible child through a written IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit. *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982); *see also Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386, 137 S. Ct. 988, 999 (2017).

32.     The IDEA requires that every IEP include, *inter alia,* a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child; a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual goals, to be involved in and make progress in the general education curriculum; and an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in activities. 20 U.S.C. § 1414(d); 34 C.F.R. § 300.320.

33.     The United States Supreme Court in its decision in *Endrew F.*, *supra*, emphasized that IDEA requires more than a program reasonably calculated to allow a student to make "some progress." *Endrew F.*, 137 S. Ct. at 997, 1000-01. Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

34.     In addition, an "educational program must be appropriately ambitious in light of his circumstances," as minimal "progress from year to year can hardly be said to have been offered

an education at all. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* at 999-1000.

35.     The progress standard set forth in *Endrew F.* is therefore consistent with, and expands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably designed to allow a student to make *meaningful* educational progress and achieve "significant learning." *K.D. v. North Pocono Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018).

36.     Furthermore, it is well-settled that "education" extends beyond discrete academic skills, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional School District*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988).

**C.      Under both IDEA and Section 504, compensatory education is an available remedy for a District's denial of FAPE to a student.**

37.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

38.     When a District fails to provide FAPE under both the IDEA and Section 504, it is well-settled that compensatory education is an available remedy. *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990); *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 250 n.11 (3d Cir. 1999); *M.C.*, *supra*, 81 F.3d at 397.

9

39.     Compensatory education is designed to provide eligible students with the services they should have received pursuant to a FAPE. *Lester H.*, *supra*, 916 F.2d at 873.

40.     Where a school district's failures deprive the student of the opportunity to benefit from an IEP, then the violation results in a substantive violation of IDEA and entitles the student to compensatory education. *Jana K. v. Annville-Cleona Sch. Dist.*, 39 F.Supp.3d 584, 603 (M.D. Pa. 2014).

41.     The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. *M.C.*, 81 F.3d at 397. Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. *Lester H.*, 916 F.2d at 873.

42.     The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

**D.      Under both IDEA and Section 504, parents must file an action within two years of their knowledge that their child's rights were violated.**

43.     The Third Circuit established that IDEA incorporates a traditional statute of limitations that requires a party to file IDEA claims within two years of reasonable discovery of the claims. *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 616 (3d Cir. 2015).

44.     In concluding that the IDEA's statute of limitations applies after discovery of the claims, the *G.L.* court connected the accrual of the statute of limitations to knowledge of the *injury*. *Id.*

45.     A child's right to compensatory education accrues from the time the school district

knew or should have known of the injury to the child, and the child is entitled to compensatory education equal to the period of deprivation. *Id*. at 618-19. "That standard is grounded in our understanding, then and now, that 'a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith.'" *G.L.*, 802 F.3d at 619 (*quoting M.C.*, *supra*, 81 F.3d at 397).

46.    A parent's knowledge of academic, emotional, or behavioral struggles at school is not *per se* knowledge that a student is or should be eligible for special education and specially designed instruction, or that the District should evaluate the student. Knowledge of particular facts may not be sufficient to trigger the statute of limitations, such as "where the issue is one that requires specialized expertise a parent cannot be expected to have." *Avila v. Spokane School District 81*, 852 F.3d 936, 944 (9th Cir. 2017).

47.    The district's action and the parent's discovery "can happen on the same day or be spread over months or years." *E.G. v. Great Valley Sch. Dist.*, 2017 WL 2260707 at *8 (E.D. Pa. May 23, 2017). Even the assumption the student is not making progress is not enough to trigger notice. . ." *Id*. at *9 (*quoting Demarcus S. v. District of Columbia*, 190 F. Supp. 3d 35, 45-46) (D.D.C. 2016)).

48.    To determine whether a claim is timely, federal courts require a "fine-grained analysis as to each claim . . ., including when the parents knew or should have known of the district's alleged deficiency." *Id.* at *1.

**E.    Where a school district violates IDEA and Section 504, it also violates ADA.**

49.    The ADA provides, in relevant part, that "no qualified individual with a disability

11

shall, by reason of such disability, be excluded from participation in or be denied the benefits of

the services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a

recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir.

1996). As with IDEA and Section 504, the ADA requires districts to offer all students FAPE without a showing of intent or bad faith as any denial of FAPE violates these federal laws. *Id.*

    **F.**    **Title IX permits a private money damages action where a recipient of federal educational funds is deliberately indifferent to discrimination.**

    50.    Title IX proscribes discrimination, exclusion, or denial of benefits on the basis of

sex in educational institutions or programs which receive federal funding. 20 U.S.C. § 1681 ("No

person in the United Stated shall, on the basis of sex, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any education program or activity receiving

Federal financial assistance[.]").

    51.    The Supreme Court and the Third Circuit have repeatedly and unequivocally recognized a private right of action to enforce Title IX, as well as a monetary damage remedy in such

private actions. *See, e.g., Davis, supra*, 526 U.S. at 640-41 (money damages for student-on-student

sexual discrimination); *Hall v. Millersville University*, 22 F.4th 397, 404 (3d Cir. 2022) (money

damages for deliberate indifference to sexual harassment by non-student guest on campus).

    52.    In *Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 283, 118 S. Ct.

1989 (1998), the United States Supreme Court recognized that a recipient of federal educational

funds violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of discrimination.

12

VI.    **Factual History**

53.    Plaintiffs incorporate by reference the preceding paragraphs.

A.    **The District's March 17, 2021 Reevaluation Report failed to appropriately and comprehensively evaluate Cheyenne's special education needs.**

54.    During the spring of Cheyenne's fifth grade, the District completed a March 17, 2021 Reevaluation Report ("March 2021 Reevaluation Report").

55.    The District's March 2021 Reevaluation Report failed to include any updated testing or rating scales including assessments of academic achievement, executive functioning, and social/emotional functioning.

56.    Before the March 2021 Reevaluation Report, the District last assessed Cheyenne in 2018 when she was in second grade.

57.    Based on the 2018 reevaluation, Cheyenne's cognitive abilities were in the average range, thus she is capable of achieving on grade level with appropriate special education services and supports.

58.    At the time of the March 17, 2021, Reevaluation, Cheyenne achieved only a 64.91 as her grade for English Language Arts, and she consistently scored Below Basic on Star benchmark assessments of reading with her scores steadily decreasing between September 2020 and January 2021 (September 2020 (237), October 2020 (207), January 2021 (151)) despite receiving special education services from the District.

59.    Her progress monitoring data, which was monitoring only reading fluency and writing conventions, showed a lack of meaningful progress.

60.    District's qualitative reading assessment indicated she was below a first-grade

instructional level despite receiving special education support since 2018.

61.    The District concluded, without any new assessments, that Cheyenne continued to display a severe discrepancy between cognitive ability and academic achievement and continued to qualify as a student with Specific Learning Disability in Basic Reading, Reading Fluency, and Reading Comprehension based on the 2018 standardized assessments.

62.    The March 2021 Reevaluation Report failed to assess Cheyenne's written expression and spelling with academic achievement testing despite that these assessments were also omitted in 2018 and despite Cheyenne's known deficits in writing.

63.    The District failed to assess Cheyenne's phonological processing, oral expression and listening comprehension, all of which are components of academic achievement testing batteries. When Cheyenne was eventually reevaluated by her cyber charter school, she was in the low or low average range in each of these areas.

64.    The March 2021 Reevaluation Report specifically noted that Cheyenne was somewhat disorganized, needed periodic assistance to find materials, and had difficulty starting tasks that were perceived to be difficult, yet the Reevaluation Report did not include any assessments of her executive functioning skills.

65.    The District failed to include any assessments of speech or language abilities despite Cheyenne's longstanding reading and written expression deficits and teacher input that Cheyenne sometimes struggles to explain where she is struggling with academic work.

66.    Speech and language assessments from a February 2025 Independent Educational Evaluation by Karen Clapper, MS CCC-SLP/ L BCS-CL revealed that Cheyenne presents with Language Processing Disorder, Spoken Language Disorder, Executive Function Disorder, and

Language-Based Learning Disability requiring school-based speech and language therapy which was never provided by the District.

67.    The Reevaluation Report included no recommendations for Cheyenne's IEP team other than continuing the current IEP. It failed to address that Cheyenne was Below Basic on benchmarking and receiving low grades in ELA with that same IEP in place.

68.    Without any new standardized scores to determine Cheyenne's academic functioning, the District's reevaluation concluded that Cheyenne only has needs in reading fluency and writing despite its continued finding that she qualifies for a Specific Learning Disability in reading comprehension and basic reading.

69.    In July 2024, an independent Neuropsychological Evaluation by Kara Schmidt, Ph.D. revealed that Cheyenne additionally has Post-Traumatic Stress Disorder, Attention Deficit Hyperactivity Disorder, and Specific Learning Disability in the areas of reading and written expression. Dr. Schmidt opined that Cheyenne qualifies under the IDEA classifications of Specific Learning Disability as well as Other Health Impairment, which was never identified by the District.

70.    The July 2024 Neuropsychological evaluation recommended special education support for, *inter alia,* reading, written expression, executive functioning, and social skills, areas that the District failed to even evaluate in 2021.

71.    The July 2024 Neuropsychological evaluation found that Cheyenne requires individualized research-based instruction in reading and writing.

**B.    The inadequate evaluation led to the creation of inadequate IEPs.**

72.    The District's failure to obtain updated information about Cheyenne's abilities and needs in the March 2021 Reevaluation Report led the creation of IEPs that failed to meet her needs

and, ultimately, to a lack of meaningful educational progress and even regression in academic skills.

73.    The District failed to provide intensive research-based specially designed instruction to Cheyenne in any area of need, and it never provided any speech and language services.

74.    Over the school years at issue (2021-22, 2022-23, and the beginning of 2023-24), Cheyenne failed to make meaningful progress, and the District did not increase her special education supports, in fact it reduced them even when its own data was showing regression.

**C.    The District's March 22, 2021 IEP denied Cheyenne a FAPE.**

75.    The District's March 22, 2021 IEP ("March 2021 IEP") was inadequate to appropriately address Cheyenne's significant educational needs.

76.    The March 2021 IEP was in place from spring of fifth grade through spring of sixth grade.

77.    District witnesses at the administrative due process hearing admitted that Cheyenne should have had measurable goals for each area of need and specially designed instruction.

78.    Cheyenne only had goals in reading fluency and writing.

79.    The fluency goal was for Cheyenne to read at the third-grade level by spring of sixth grade, and thus to remain three years behind grade level without any expectation to close the gap.

80.    The writing goal asked Cheyenne to write six complete sentences with correct spelling. The District only monitored the spelling and whether Cheyenne wrote six sentences, ignoring other critical areas of written expression.

81.    When measuring Cheyenne's spelling, the District counted every word in a writing

16

sample including simple and highly commonly used words like "the," "a," "I," "it," "and," which misleadingly inflated Cheyenne's total score making it look like she was making progress—because of this she often earned scores of 90% even when her writing was replete with obvious and significant spelling areas that were not grade or age appropriate.

82.    For example, Cheyenne's progress monitoring reported 90% accuracy for a writing sample in which she wrote "caved" for "carved," "walk" for "woke," "brefist" for "breakfast," "strage" for "strange," "oley" for "only," and "stoll" for "stole," because 53 out of 59 total words (most of which were simple, commonly-used words) averaged out to 90% correctly spelled.

83.    These significant spelling issues persisted. By late February of Cheyenne's sixth grade school year, IEP progress monitoring writing samples included the following misspellings: "olny" for "only," "hafe" for "half," "galin" for "gallon," "frush" for "fresh," "travol" for "travel," "bottals" for "bottles," "wolk" for "woke," "brite" for "bright," "bout" for "boat," "want" for "went," and "buch" for "bunch" but her progress was still reported as 90%.

84.    Her IEP did not include any research based direct instruction in phonological processing, encoding (spelling), or written expression to address these errors.

85.    Cheyenne's IEP lacked goals and specially designed instruction in reading comprehension and basic reading even though these were identified areas of Specific Learning Disability per the District's March 2021 Reevaluation Report.

86.    The only Specially Designed Instruction in reading listed in Cheyenne's IEP was small group reading with a focus on fluency and accuracy. At the due process hearing, the District admitted that this small group instruction was not using any research-based direct instruction program and that Cheyenne was not receiving direct instruction for the full duration, as her teacher

would also provide support and instruction to other students who had distinct needs.

87.    Cheyenne participated in the general education English program using the Units of Study curriculum, in which she tested three years below grade level at the second-grade level.

88.    Despite Cheyenne's Specific Learning Disabilities in three areas of reading, her decreasing Star benchmarking scores (September 2020 (237, Below Basic range), October 2020 (207, Below Basic), January 2021 (151, Below Basic), February 2021 (126, Below Basic)), her mid-second grade reading level, and her D in English Language Arts, Cheyenne received only small group instruction to address fluency and accuracy only and without any research-based program.

89.    Cheyenne's sixth grade special education teacher, Ms. Chandler, testified that she implemented the small group instruction for 35 minutes per day from the beginning of the 2021-2022 school year referenced in the March 22, 2021 IEP. However, the instruction was not 35 minutes of direct instruction in basic reading skills, reading fluency, and reading comprehension, and there was no implementation of any research-based program at all. Rather, the instruction occurred during "WIN" period ("What I Need," a period for every student in the District). During this period, Ms. Chandler had other students coming in and out of her classroom for instruction they need, which could include reading needs that are different from Cheyenne's, math needs, executive functioning needs, or whatever else those students may need.

90.    The March 2021 IEP reported that "Cheyenne is inconsistent with her completion of assignments" and "Cheyenne is easily distracted by outside stimuli and during general education she is often unfocused."

91.    At the administrative due process hearing, Cheyenne's teacher testified that work

completion issues and distraction are indicative of executive functioning needs; yet, there were no goals to address Cheyenne's executive functioning needs.

92.    The District found Cheyenne not eligible for Extended School Year services despite that she was functioning three years below grade level in reading.

93.    The District's Penndata reporting in the March 2021 IEP was inaccurate, as it incorrectly reported Cheyenne was placed outside of Regular Education for almost two hours of each school day, when Cheyenne was only outside of the Regular Education environment for one period per school day.

**D.    The District's March 1, 2022 IEP denied Cheyenne a FAPE.**

94.    The District's March 1, 2022 IEP ("March 2022 IEP"), developed in the spring of sixth grade, similarly denied Cheyenne a FAPE.

95.    The March 2022 IEP still did not include measurable goals in all areas of need and did not include research-based direct instruction in any area, and it even removed the only specially designed instruction in reading (the small group instruction for fluency and accuracy) that Cheyenne received from the March 2021 IEP despite that Cheyenne remained three years below grade level even in fluency.

96.    The March 2022 IEP included only accommodations without specially designed instruction in any area.

97.    Cheyenne again only had goals in reading fluency and writing.

98.    Cheyenne's fluency goal projected that she would remain three years below grade level even if she achieved it at the end of the IEP term.

99.    The March 2022 IEP no longer even monitored Cheyenne's spelling in its writing

goal despite her obvious spelling errors in her writing samples from sixth grade.

100.    At the hearing, the District admitted that Cheyenne continued to have spelling needs at the time the IEP was written, but they were not addressed in the March 2022 IEP.

101.    Cheyenne's IEP lacked any goals or specially designed instruction in reading comprehension despite her scores on the Star Reading Assessment (1.9 reading level in September 2021, 3.4 in December 2021, and 2.8 in January 2022), all of which are significantly below grade level.

102.    At the hearing, the District admitted that her instructional level was third grade in reading comprehension according to the District's Qualitative Reading Inventory by the Spring of her sixth grade school year.

103.    The IEP did not include any goals or specially designed instruction for Cheyenne's Specific Learning Disabilities in basic reading and reading comprehension.

104.    During seventh grade, when this IEP was in place, Cheyenne's special education teacher would merely go into Cheyenne's Regular Education ELA and Math classes where she would walk around the room to see if Cheyenne or other students needed help.

105.    At the hearing, the District's witness clearly testified that there was no researched-based reading program used for Cheyenne.

106.    The District incorrectly determined that Cheyenne was not eligible for Extended School Year services despite being three years behind grade level and despite her scores which did not show meaningful progress.

20

**E.   The District's revised Cheyenne's IEP in November 2022, but it still failed to include the Specially Designed Instruction and supports she needed.**

107.   On November 15, 2022 (fall of seventh grade), the District revised Cheyenne's IEP.

108.   The District convened the IEP meeting to discuss Parent's concern with math anxiety and to consider whether Cheyenne needed a math goal.

109.   The District only added an accommodation for word problems to be read aloud to Cheyenne, which failed to adequately address her anxiety, math needs, and reading needs within her math or other general education classes.

110.   Cheyenne continued to receive only accommodations in her IEP and did not receive any specially designed instruction or research-based reading instruction.

111.   During seventh grade, while this IEP was in place, Cheyenne received minimal support from a special education teacher for one 45-minute period of the school day, when the teacher would help Cheyenne and other students—who were not necessarily struggling in the same areas as Cheyenne—with homework, re-reading, or progress monitoring.

112.   When asked what she provided to Cheyenne, the seventh grade special education teacher, Ms. Toth, testified that they "might re-read a chapter in the reading story or I'll read my – sometimes I would help her with her homework or project that she needed assistance with. Sometimes we do progress monitoring as well. Basically, whatever she needed or asked, you know, I helped with what I could."

**F.   The District's February 21, 2023 IEP failed to provide a FAPE.**

113.   The District's February 21, 2023 IEP ("February 2023 IEP") was developed during the spring of Cheyenne's seventh grade school year.

114. At the time the District created the February 2023 IEP, it was aware that Cheyenne continued to score at the second to third grade level on the Star Reading assessment (September 2022, 2.5 grade level; November 2022, 3.9 grade level; January 2023, 3.1 grade level). Despite these inconsistent scores and the regression between November 2022 and January 2023, the District did not add back any specially designed instruction in reading and did not include any research-based direct instruction in reading for Cheyenne.

115. Cheyenne was now scoring more than four years behind grade level, demonstrating regression and a widening gap between her average abilities and her large deficits in reading.

116. According to the District's IEP progress monitoring for Cheyenne, she completed her seventh grade school year on a 2.5 reading level based on the Star Reading Assessment, which meant she was moving into her eighth grade school year functioning 5.5 years below grade level.

117. Likewise, the District's progress monitoring reported she was then more than two years below grade level in math, yet no math goals were added to her IEP.

118. As with the previous IEPs, Cheyenne lacked goals in basic reading although it was an area of Specific Learning Disability.

119. Cheyenne's writing goal did not address her spelling difficulties.

120. Cheyenne's reading fluency goal was removed even though she remained years below grade level in this area.

121. The little support Cheyenne was receiving from the special education teacher was reduced to two-three days per week from five days.

122. The February 2023 IEP continued to include only accommodations and no specially designed instruction.

123.    The IEP also incorrectly stated that Cheyenne received supplemental Learning Support when she was actually placed in a regular education setting for 96% of her school day.

124.    The school counselor or guidance counselor (used interchangeably) began seeing Cheyenne every Friday, in March 2023 due to her anxiety, but this was never added to Cheyenne's IEP.

125.    The counselor did not implement a research-based program or develop any goals.

126.    The counselor never talked to the Director of Special Education about providing services to address her anxiety pursuant to her IEP.

**G.      From the start of the 2021-22 school year through September 17, 2023, Cheyenne failed to make meaningful educational progress and even regressed but the District consistently reduced her special education supports.**

127.    The District's data show a lack of meaningful educational progress and even regression, but the District failed to appropriately respond to provide Cheyenne the necessary special education and related services to enable her to make progress.

128.    The District's progress monitoring revealed that Cheyenne was not making progress on the few areas that were assessed, and scores from her reevaluation after transferring to a cyber charter school revealed that she had not made progress in additional areas as well.

129.     A Qualitative Reading Inventory was used to progress monitor Cheyenne's reading fluency. Her score from the end of marking period one (58) to the end of marking period two (48) regressed. By the end of marking period three, Cheyenne was still scoring lower than at the beginning of the year (53). The District did not revise her IEP to address these scores.

130.    Cheyenne was merely instructional on a third-grade level in reading comprehension according to the District's Qualitative Reading Inventory by the Spring of her sixth grade school

year. Thus, she went from being only one year below grade level when she was in the second grade to three years below grade level in the sixth grade.

131.    During Cheyenne's seventh grade (2022-2023) school year, the results of the Star Reading Assessment, which the District used to monitor Cheyenne's progress in reading, showed a lack of meaningful progress (starting and ending the year with nearly identical scores and with the same 2.5 grade equivalency) (September 2022, 906, Below Basic, 2.5 grade equivalent (GE); November 2022, 990, Basic, 3.9 GE; January 2023, 947, Below Basic, 3.1 GE; March 2023, 981, Below Basic, 3.7 GE; and May 2023, 905, Below Basic, 2.5 GE).

132.    Cheyenne was scoring at the 2.5 grade level in May 2023 as she was about to enter eighth grade.

133.    Cheyenne did not make progress in spelling throughout sixth grade. She was still making the same spelling errors at the end of the 2021-22 school year as she was in the beginning. Despite this the District stopped progress monitoring spelling.

134.    Moreover, when comparing the scores from Cheyenne's academic achievement testing (which the District only conducted in 2018, second grade) with the scores from the same assessments that were readministered by her new charter school in November 2023 (eighth grade), Cheyenne indisputably did not make progress and even regressed.

135.    During the due process hearing, the District's School Psychologist testified that the academic achievement scores from second grade and December of eighth grade can be compared to determine if Cheyenne made progress. She did not make progress according to this comparison.

136.    Cheyenne scored lower in Reading, Word Reading, and Pseudoword Decoding in November 2023 than she did in March 2018, showing a widening gap.

137. Cheyenne's standard score on the reading comprehension subtest improved by only one point between 2018 and 2023, showing that she did not make progress and failed to close the gap between her average cognitive abilities and her low average reading comprehension.

138. The District's School Psychologist testified that we would expect students with Specific Learning Disabilities to close the gap between their abilities and achievement over time.

139. She further testified that if the gap is widening between abilities and achievement over time, it would indicate regression based on those scores.

**H.    The District failed to appropriately respond to Cheyenne's sexual harassment by another peer.**

140. Cheyenne was sexually assaulted in school by another student from November 2022 through May 2023 who would touch her, including on her upper inner thigh, numerous times at school and during classes throughout this period.

141. When the assaults were later reported to the police, Cheyenne stated that she provided more than 20 written incident reports to the District's office.

142. Cheyenne reported to the police officer that she, at times, tried to make verbal reports but staff were unavailable or unreceptive.

143. The District claims it only received two reports regarding the assaults, but it failed to appropriately respond even to those two as it did not complete any investigation under either its bullying/harassment policies or Title IX, and Cheyenne's teachers and parents were not even notified.

144. Cheyenne's teachers were not notified to separate Cheyenne and the harasser.

145. Even after the District promised to keep them in separate classes, it failed to do so.

146. On May 23, 2023, Cheyenne completed the following written report submitted to

25

the District office: "[Peer] wont stop touching me and it is making me uncofertable. I have told

her so many times to stop but she is not stopping. She always grabbes my legs and pulls me by my

legs."

147.    On May 24, 2023, Cheyenne completed the following written report submitted to

the District office: "[Peer"] has been touching me in weird ways and it is makeing me feel unco-

fortable. I have asked her to stop many times and she wolt stop. Mrs. Santore saw I was down and

I told her what was wrong." The perpetrator is the same student.

148.    The District never reported to Cheyenne's parents that she had been inappropriately

touched by another student against her wishes that made her feel uncomfortable.

149.    Cheyenne did not advise her parents of the assaults until May 25, 2023.

150.    Once Cheyenne told her mother, her mother reported it to the police the next day.

151.    As a result of the police going to the District, Cheyenne's parents were told Chey-

enne would not have to be in the same periods as the student who assaulted her.

152.    Cheyenne's mother testified that Cheyenne was struggling at the end of the 2022-

2023 school year and did not want to attend school.

153.    Cheyenne wanted to go into the 2023-2024 school year with a positive outlook, but

when she returned to school in the Fall of 2023, she was placed in the same period as the student

who had assaulted her.

154.    On September 14, 2023, Cheyenne's mother emailed her special education teacher:

"...I would like to have a meeting with you and Cheyenne to go over her IEP. She is really strug-

gling in class and really wants to make this year her year and it's not going well so far." Cheyenne's

mother testified that she wanted to see "if there was something we could do with her IEP to help

26

her not struggle and get more focused back into the year."

155.    Cheyenne's parents decided they needed to remove Cheyenne from the District when Cheyenne continued to be placed in classes with her harasser during the fall of 2023.

**I.    The Family withdrew Cheyenne from the District and received updated evaluations which, for the first time, showed significant needs that the District has failed to identify, evaluate, and address.**

156.    The Family withdrew Cheyenne from the District on September 27, 2023.

157.    Cheyenne enrolled in a cyber charter school, which reevaluated her and issued a December 21, 2023 Reevaluation Report ("December 2023 Reevaluation Report").

158.    The December 2023 Reevaluation Report was the first time since 2018 that Cheyenne's cognitive, academic achievement, and social, emotional and behavioral functioning were assessed.

159.    Cheyenne scores in the Low range on Reading (6th percentile), Word Reading (5th percentile), Phonological Processing (5th percentile), Phonemic Proficiency (1st percentile) Orthographic Processing (3rd percentile), Orthographic Fluency (2nd percentile), Spelling (4th percentile), and Basic Reading (4th percentile), Dyslexia Index (5th percentile), Oral Language (5th percentile), Listening Comprehension (4th percentile) and Oral Expression (10th percentile) clusters/subtests suggesting Dyslexia characteristics and language-based learning deficits.

160.    Social, emotional, and behavioral rating scales revealed At Risk scores for Anxiety, Withdrawal, and Functional Communication from Parent.

161.    Cheyenne's self-ratings were At Risk for Atypicality, Anxiety, Sense of Inadequacy, Attention Problems, Hyperactivity, and Self-Reliance and Clinically Significant Interpersonal Relations.

162.    Cheyenne's Neuropsychological Evaluation and Speech and Language evaluation similarly revealed needs that were unaddressed in the District.

**J.    The Parent did not know nor should she have known of the District's failure to meet Cheyenne's educational needs until she received the December 2023 Reevaluation Report.**

163.    While there were certainly indications in Cheyenne's academic performance at school that should have triggered the District—professional, trained educators—to complete the necessary evaluations that would have indicated Cheyenne's academic needs, that is not the standard applicable to determine whether the parents had knowledge or reason to know of the violations.

164.    Cheyenne's mother works at Dominos. Cheyenne's father is a maintenance mechanic.

165.    They are not educators nor psychologists and have no experience or training in special education or special education law and cannot be reasonably expected to know that the District failed to assess Cheyenne in certain areas and that the District was inaccurately reporting Cheyenne's time in special education instruction, making it appear that her IEPs were providing more than they were.

166.    The District was consistently reporting to Cheyenne's parents that her needs were being met via her IEP.

167.    It was not until Cheyenne left the District and enrolled in a cyber charter school that she was evaluated (in the December 2023 Reevaluation Report) and those scores showed that she had needs that the District failed to address and had not made progress during her time in the District.

168.    The Family filed the due process complaint on October 7, 2024. As such, the Parent

initiated due process within two years of when she knew or should have known that Cheyenne required additional support that the District failed to provide.

## VII.    **The Hearing Officer's Errors**

169.    The Plaintiffs incorporate by reference the preceding paragraphs.

170.    The Hearing Officer's conclusion that the Family is not entitled to any relief is based on evidence that was significantly contradicted in the record and is based on errors of law relating to the legal standard for the statute of limitations and the legal standard of a Free Appropriate Public Education.

171.    The Hearing Officer misapplied the statute of limitations Knew or Should Have Known ("KOSHK") analysis when she focused on whether an evaluation revealed "that the District should have suspected additional needs at the time Student was enrolled," which is not the appropriate legal standard.

172.    The appropriate standard and inquiry for KOSHK is whether the parents had sufficient *knowledge* to trigger the statute of limitations. This is distinct from a school district's obligations to evaluate a student when it *suspects* a potential disability.

173.    In *Peter G. v. Derry Township School District*, Judge Saporito analyzed the two distinct requirements—a school district's requirement to evaluate upon suspecting disability and a parent's requirement to file a complaint when the parent knew or should have known of the violation: "This trigger for the two-year IDEA limitations period—the date when the parents knew or should have known the school district's failure to provide the child with a FAPE—may be fairly contrasted with the school district's 'child find' obligation, which is triggered if the school district reasonably suspects a child of having a disability." 2025 WL 270057, at *6 n.29 (M.D. Pa. Jan.

29

22, 2025) (*citing A.B. ex rel. K.B. v. Abington Sch. Dist.*, 440 F. Supp. 3d 428, 434 (E.D. Pa. 2020);

*A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, 2015 WL 390864, at *9 (M.D. Pa. Jan. 28, 2015)).

174.    Here, the Hearing Officer conflated the standard applicable to the District's child find obligations (reasonably suspecting a disability) with the standard applicable to the Parents' obligation to timely file a complaint (knowledge of the violation of the child's rights) when she stated that "[t]he major premise of the Parent's statute of limitations argument is that she had no *reason to suspect* that the District failed to identify certain needs of Student while enrolled in its schools until the IEE [independent educational evaluation] reached different, more expansive conclusions about Student's disabilities." (emphasis added).

175.    By incorrectly applying the reason to suspect standard to the parents, the Hearing Officer misapplied the law and inappropriately tasked the Parents with the District's burden to evaluate when there is reason to suspect disability. In contrast, the law only requires parents to act once they have actually discovered the educational deficiency—that is, once they have knowledge of the deficiency, not a mere "reason to suspect" the District is failing in its duties.

176.    Moreover, the Hearing Officer even misconstrued the Family's argument: the Family argued very clearly that the KOSHK date was the date that they received the December 2023 Reevaluation Report from the cyber charter school, yet the Hearing Officer incorrectly stated it was based on the date of an IEE. The Family was not basing its argument on the date of either IEE in this matter.

177.    Likewise, the Hearing Officer excused the District's inappropriate March 2021 Reevaluation Report because of the circumstances of the COVID-19 pandemic even though IDEA's and Section 504's standards were not lessened, and schools had reopened at that time.

178.    The Hearing Officer ignored the many new and low scores in the December 2023 Reevaluation Report which revealed that the District was not meet Cheyenne's needs. She instead inaccurately described the December 2023 Reevaluation Report (which included significant updated testing and testing in areas never assessed by the District) as "rather consistent with" the District's evaluations (which had failed to include *any* updated testing since second grade).

179.    Likewise, the Hearing Officer misapplied the progress standard set forth in *Endrew F., supra,* and longstanding Third Circuit case law.

180.    Instead of requiring meaningful education progress, the Hearing Officer permitted: "variable but overall growth," "widely variable . . . but a trend toward growth," "poor grades," "well below grade expectations," "reasonable progress," progress that was "not robust," "attaining only slight growth through variable performance."

181.    The Hearing Officer excused the District's lack of evaluation or analysis to determine why Cheyenne was making little or no progress, stating "reasons for the widely variable performance do not appear to have been monitored closely or identified," even though comprehensive evaluations to determine a student's needs are required by IDEA.

182.    The Hearing Officer determined instead that, for Cheyenne, a student with average cognitive abilities, widely variable performance—all of which was several years below grade level even at its highest measurements—was somehow "meaningful even if perhaps not ideal," turning the legal standard of meaningful educational progress on its head.

183.    Likewise, the Hearing Officer inaccurately found goals seeking a mere 75% accuracy from the student appropriate, even though these cannot be said to be "ambitious" as required by IDEA and 90% accuracy has been found to be an appropriate level of mastery.

184.    The Hearing Officer incorrectly determined that the Family failed to meet its evidentiary burden to prove Cheyenne's speech and language needs were unmet in the District when it presented evidence through three evaluations that showed Cheyenne had speech/language needs that were unidentified in the District. The District's witness was merely "equivocal" in response and yet the Hearing Officer found that the Family failed to meet its burden.

185.    Critically, the Hearing Officer failed to conduct a separate analysis under Section 504, failing to consider whether the District failed to appropriately identify and provide FAPE to Cheyenne under Section 504's more expansive eligibility criteria.

186.    The Hearing Officer inexplicably excused the District from its obligation to include goals and instruction in reading comprehension (an identified area of Specific Learning Disability) calling it a "relative strength," which is in direct contradiction to the definition of Specific Learning Disability. An area of Specific Learning Disability by definition cannot be an area of strength.

187.    The Hearing Officer ignored the testimony of District witnesses who verified that Cheyenne was functioning several years below grade level and instead determined that "[grade equivalency scores] *do not* mean that a student is functionally performing at a specific grade level."

188.    The Hearing Officer excused the lack of research-based reading instruction for a student with Specific Learning Disabilities who was being monitored on skills that were three or more years below grade level, explaining, in a complete non-sequitur, "[w]here lack of memory is a significant hurdle, as is the case here, one cannot assume that this assertion by Parent is accurate, and it is certainly not preponderant." Yet every District witness testified without difficulty that there was no research-based reading program offered by the District, and the IEP does not describe or even allude to any.

189.    The Hearing Officer incorrectly found that the District acted appropriately when it failed to investigate or respond to Cheyenne's reports of sexual harassment at school; even after the District was indisputably on notice of the harassment from two reports that the District admits it received and a police investigation which occurred while Cheyenne was still enrolled, the Hearing Officer somehow concluded that the District "was not made aware of the asserted multiple inappropriate peer interactions."

190.    The District was deliberately indifferent to Cheyenne's reports of sexual harassment from a peer when it failed to appropriately investigate and respond to the reported sexual harassment and when it failed to separate Cheyenne from the harasser.

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

1.    Assume jurisdiction over this action;

2.    Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, the ADA and Pennsylvania law; and

3.    Reverse the decision of the Hearing Officer's decision and (1) hold that all claims were timely because the Parents did not discover, i.e., did not know or should have known of the District's failures to meet Cheyenne's needs until—at earliest—she received a December 21, 2023 Reevaluation Report from her new charter school revealing additional unmet special education needs; (2) award the Family full days of compensatory education from the beginning of the 2021-22 school year until Cheyenne's withdrawal from the District on September 27, 2023; (3) find that the District failed to appropriately respond to the sexual harassment that Cheyenne experienced in school and award money damages for the District's deliberate indifference to the

sexual harassment; (4) award reasonable attorneys' fees and costs to Cheyenne's Family; and (5)

award any other relief this Court deems just.

Respectfully submitted,

/s/ *Jacqueline C. Lembeck*
Jacqueline C. Lembeck, Esquire
PA ID No. 314535
jlembeck@mcandrewslaw.com

/s/ *Heather Hulse*
Heather M. Hulse, Esquire
PA ID No. 164134
hhulse@mcandrewslaw.com
McANDREWS, MEHALICK, CONNOLLY,
HULSE and RYAN, P.C
2 West Olive Street
Scranton, PA 18508
O: (570) 969-1817
F: (570) 969-0955
Attorneys for Plaintiffs